[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MARCH 26, 2002
THOMAS K. KAHN
CLERK

————————————

No. 99-4172

————————————

D. C. Docket No. 96-06553-CV-JAG

PATRICIA WALKER, MARLENE J. GOLUB,

Plaintiffs-Appellants,

versus

PRUDENTIAL PROPERTY AND CASUALTY
INSURANCE COMPANY,

Defendant-Appellee.

————————————

Appeal from the United States District Court
for the Southern District of Florida

————————————
**(March 26, 2002)**

Before GODBOLD, COX and MESKILL[*], Circuit Judges.

COX, Circuit Judge:

---

[*]Honorable Thomas J. Meskill, U.S. Circuit Judge for the Second Circuit, sitting by designation.

Patricia Walker and Marlene J. Golub appeal the district court's grant of summary judgment in favor of Prudential Property & Casualty Insurance Company on their employment discrimination claims under Title VII, 42 U.S.C. § 2000e, et seq. They also seek review of certain discovery orders. Because Walker and Golub have produced no evidence that Prudential discriminated against them, we affirm the district court's grant of summary judgment. Furthermore, since Walker and Golub have not shown a nexus between the complained of discrimination and the evidence sought in discovery, we affirm the district court's denial of those motions.

## I. BACKGROUND

Prudential is a national insurance company with numerous divisions, some of which have offices in Florida. Walker and Golub were employees in the South Florida division of Prudential, located in Fort Lauderdale. On September 7, 1994, the manager of the Fort Lauderdale office, Tom Jackson, announced to the South Florida employees that Prudential would close its Fort Lauderdale office on December 2, 1994. Also attending this announcement were Joseph Putz, Prudential's Regional Director, and Adell Jones, Prudential's Human Resources Consultant.

After the closing, Prudential planned to transfer the existing files and claims in Fort Lauderdale to the office in Orlando, so Prudential offered to transfer all licensed Claims Representatives in Fort Lauderdale to Orlando as well. The Orlando office

2

had an existing operations staff to handle the clerical and administrative duties, though, so none of the Fort Lauderdale operations staff was offered an Orlando position at that time. The operations staff in Fort Lauderdale included six people, five women and one man. Walker and Golub were two of the women on the operations staff.

Walker had worked for Prudential since her senior year in high school. In 1959, she left Prudential to raise a family, but she returned in 1977. Walker had extensive experience in the administrative aspects of the South Florida operation, and she was consistently rated as excellent on her evaluations.

Golub began working at Prudential on a permanent basis in early 1990. After a brief maternity leave, she became a Dispatcher and eventually served as Senior Dispatcher. At the time of the announcement, she was a Salvage Clerk and backup Dispatcher.

Todd Hyland, the sole male on the Fort Lauderdale operations staff, was Senior Dispatcher and had served as a dispatcher for many years. Immediately after the announcement, he told Jones that he was not only willing to transfer to Orlando, but also to Jacksonville or any other place within the company. Hyland followed up on his conversation with Jones by speaking with Thomas Conner, the manager of the Orlando office, a couple of weeks after the announcement. Hyland asked Conner if

3

there were any jobs available in Orlando, either in the first report unit or the claims office, and offered to relocate with no compensation from Prudential. Conner told Hyland that there were no positions available at that time.

As December approached, Conner was concerned about filling the Claims Representative positions because some Fort Lauderdale Claims Representatives had not agreed to transfer to Orlando. To fill an available claims representative position, Conner asked Willeva Meuse, a licensed Claims Representative, to return to the claims department. Meuse had previously served as a Claims Representative in the Orlando office, but she had been moved to Dispatcher in a previous round of downsizing. Meuse was still serving as Dispatcher in Orlando when Conner made the request, but she agreed to return to the claims department.

Meuse, when she was the Orlando Dispatcher, occasionally spoke with Hyland, the Fort Lauderdale Senior Dispatcher, about job-related issues. In October or November of 1994, Hyland told Meuse that he was looking for a new job due to the Fort Lauderdale closing. She told him to call a manager in Orlando to let that office know he was interested in a job there. Meuse denies that she had other conversations with Hyland about this topic, but Golub claims that "Todd told me that Willeva said if I go to claims, will you take this dispatch position, and he said yes." (R.1-34 at 88.) In other words, according to Golub, Meuse was only willing to move from the

4

Dispatcher position if Hyland would replace her.

Whether motivated by concern for Hyland or not, Meuse's transfer opened the Dispatcher position in Orlando. On November 9, Conner sent Jones a PROFS note[1] informing her that the Orlando office needed a Dispatcher. Conner also asked whether he could contact Hyland for the position since Hyland "has all the skills needed for this job." (R.4-182-Ex. C at 3.) The opening for Dispatcher in Orlando was never posted to other Prudential employees.

Prudential's Human Resources department often posted job openings within the company, but Human Resources had discretion over when such postings were made. Adell Jones, who was the Human Resources manager at the time, testified that the Dispatcher vacancy arose late in the process and that she decided to make a direct placement for timing reasons.

After hearing that the South Florida office would close, both Walker and Golub were willing to accept a job with Prudential anywhere in the nation. However, neither Walker nor Golub ever expressed this willingness to anyone at Prudential.[2] Nor did they offer to pay their own expenses to relocate to Orlando or another office.

---

[1]PROFS was the internal electronic mail program at Prudential, and a PROFS note is similar to an e-mail.

[2]Indeed, Walker and Golub first expressed their desire to relocate when they filed their affidavits opposing summary judgment.

Though Hyland was the only employee who had made a call to Conner, Jones decided to "do the right thing" by reviewing the files of the entire operations staff. (R.3-130 at 42-43, 46-47.) This process, according to Jones's estimate, took a week to two weeks. After her review, Jones decided that Hyland was the most qualified person for the job, and she called Hyland to offer him the job. Hyland testified that he was offered the job approximately three weeks before the Fort Lauderdale office closed. He began work as Dispatcher in Orlando on December 5.

In April 1995, Walker filed age- and sex-discrimination charges against Prudential with the EEOC , and Golub filed a sex-discrimination charge. They sued Prudential in May 1996.

## II. PROCEDURAL HISTORY

The district court granted summary judgment to Prudential. The district court determined that Walker and Golub had established a prima facie case of discrimination. In response to the prima facie case, Prudential asserted that it hired Hyland because he was the most qualified candidate for the position, and the district court concluded that there was no evidence that this assertion was pretextual. Walker and Golub appeal this grant of summary judgment.

Prior to summary judgment, the district court denied Walker and Golub's motion to compel the testimony of Karen Miklesh. The court also granted a protective

order to Prudential preventing Walker and Golub's access to certain testimony by Tippy Rogers. Walker and Golub assert error in both of these discovery orders.

## III. ISSUES ON APPEAL

Walker and Golub contend that summary judgment on their discrimination claims was improper because the evidence discredits Prudential's assertion that Hyland was more qualified for the Dispatcher position. Walker and Golub also seek access to testimony that is protected by confidentiality agreements.

## IV. STANDARD OF REVIEW

This court reviews a grant of summary judgment de novo, applying the same familiar standards as the district court. *See Witter v. Delta Air Lines, Inc.*, 138 F.3d 1366, 1369 (11th Cir. 1998). We review discovery orders for abuse of discretion. *See Porter v. Ogden, Newell, & Welch*, 241 F.3d 1334, 1338 (11th Cir. 2001).

## V. DISCUSSION

### A. DISCRIMINATION CLAIMS

In the absence of direct evidence of employment discrimination, a plaintiff may create a presumption of discriminatory intent by establishing a prima facie case of discrimination. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973); *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000) (en banc). "There are a number of ways of establishing a *prima facie* case pursuant to

*McDonnell Douglas.*" *Hawkins v. CECO Corp.*, 883 F.2d 977, 982 (11th Cir. 1989). Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for his adverse action. *See Chapman*, 229 F.3d at 1024. When such a reason is articulated, the presumption of discrimination is eliminated, and the plaintiff must submit evidence showing that the articulated reason is pretextual. *See id.* If pretext is established, summary judgment in favor of the defendant is generally inappropriate. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000)*; Chapman*, 229 F.3d at 1025 n.11; *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997).

"Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent." *Silvera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001). When evaluating a charge of employment discrimination, then, we must focus on the actual knowledge and actions of the decision-maker. *See Bass v. Board of County Comm'rs*, 256 F.3d 1095, 1105 (11th Cir. 2001).

Walker and Golub make alternative arguments regarding the actual decision-maker. First, they ask us to view Conner as the actual decision-maker. Next, they argue that, even if Jones were the actual decision-maker, Prudential's assertion that she made a qualifications-based decision is pretextual. We are viewing the evidence

8

in the light most favorable to Walker and Golub, and, therefore, we will analyze the employment decision from the perspective of both Tom Conner and Adell Jones as decision-makers.

## 1. TOM CONNER

Tom Conner was the Orlando Field Claim Office Manager when the Fort Lauderdale office closed. As manager, he was responsible for the operation of the Orlando office and the management of employees. He shared the ultimate authority on hiring decisions with the Human Resources Department.

When the Orlando Claims Representative positions were not filled as expected, Conner transferred Meuse, a licensed Claims Representative, to an available Claims Representative position. This transfer opened the Orlando Dispatcher position. Since there were no other trained Dispatchers in Orlando, Conner sent a PROFS note to Adell Jones, informing her that he needed a Dispatcher. Conner testified that the Human Resources Department handled the hiring from that point. However, it is clear from Conner's PROFS note that he inquired specifically about Hyland for the Dispatcher position.

This case presents an ordinary failure-to-hire issue.[3] The standards for a prima

---

[3]Walker and Golub contend that they have established a prima facie case of failure-to-relocate. They cite *Curto v. Sears, Roebuck & Co.*, 38 Fair Empl. Prac. Cas. (BNA) 547 (N.D. Ill. 1984), for the elements of a prima facie case of failure-to-relocate. Even if *Curto* articulates the correct standards, it is easily distinguishable from this case. In *Curto*, the company

facie case of failure-to-hire are thoroughly established. The burden is on the plaintiff to show that she is a member of a protected class, that she applied for and was qualified for an available position, that she was rejected, and that the defendant filled the position with a person outside of the protected class. *See Walker v. Mortham*, 158 F.3d 1177, 1192 (11th Cir. 1998) (quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S. Ct. 2363, 2378 (1989)).

Walker and Golub have not established a prima facie case of discrimination if Conner was the decision-maker.[4] It is clear that Walker and Golub were members of the protected class and that the Dispatcher position was filled by a person outside of

---

maintained a policy of finding new positions for its eliminated employees. *See id.* In this case, Prudential had no such relocation policy and informed the operations staff that they would not, in fact, be relocated.

[4]This issue was not raised in the district court or on appeal to this court because Prudential has consistently maintained that Jones was the sole decision-maker. While we may affirm for any reason, *see Solitron Devices, Inc. v. Honeywell, Inc.*, 842 F.2d 274, 278 (11th Cir. 1988), we are usually reluctant to address an argument that the parties have not raised, especially in civil cases. *See, e.g, Denney v. City of Albany*, 247 F.3d 1172, 1182 (11th Cir. 2001). This reluctance, however, is discretionary, not mandatory. When addressing the issues in a case, we are not precluded by counsel from applying the law to the record before us. *See Olson v. Superior Pontiac-GMC, Inc.*, 776 F.2d 265, 267 (11th Cir. 1985); *see also Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99, 111 S. Ct. 1711, 1718 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."). "The contrary conclusion would permit litigants, by agreeing on the legal issue presented, to extract . . . an opinion that would be difficult to characterize as anything but advisory." *United States Nat'l Bank of Oregon v. Independent Ins. Agents of Am., Inc.*, 508 U.S. 439, 446, 113 S. Ct. 2173, 2178 (1993). In this case, Walker and Golub have urged us to view Conner as the actual decision-maker, and it is not unfair to accept their theory and its logical implications.

10

the protected class. However, it is also clear that Walker and Golub never applied for the Dispatcher position and, thus, were never explicitly denied it.

The prima facie case creates a presumption of discrimination. The application requirement is important to establishing this presumption because it shows that the decision-maker knew about the plaintiff and the plaintiff's interest in the position. *See Carmichael v. Birmingham Saw Works*, 738 F.2d 1126, 1133 (11th Cir. 1984). If a decision-maker is unaware of the plaintiff's existence, then he is simply unable to discriminate against her, and any presumption of discrimination is unfounded. *See Pressley v. Haegar*, 977 F.2d 295, 297 (7th Cir. 1992) ("An empty head means no discrimination."), *quoted in Sivera v. Orange County Sch. Bd.*, 244 F.3d 1253, 1262 (11th Cir. 2001). When he made the decision, Conner knew Walker by name only and did not know Golub at all. Nor was he familiar with their performance as employees. Therefore, we cannot presume that Conner discriminated against Walker and Golub specifically.

However, a broader form of discrimination may arise where a decision-maker disseminates information about available positions through informal channels. We have said that "when an employer uses such informal methods it has a duty to consider all those who might reasonably be interested" in the available position. *Carmichael*, 738 F.2d at 1133. When other employees are not aware of the position's availability,

it is "legally insufficient and illegitimate" for the employer to assume that they are not interested in it. *Harris v. Birmingham Bd. of Educ.*, 712 F.2d 1377, 1383 (11th Cir. 1983).

Although the position in this case was filled by rather informal means, this case is unlike *Carmichael* and *Harris* in every other way. While those cases involved promotions within the same city, this case involves similar positions in cities that are over two hundred miles apart. Prudential had already been unable to persuade some of its Fort Lauderdale claims representatives to move to Orlando, forcing Conner to reallocate some of his Orlando personnel. Since the Orlando Dispatcher position required a substantial move that many employees had been reluctant to make, Conner had no reason to believe that other Fort Lauderdale employees would be interested in it, and there is no evidence to suggest otherwise.

The vicissitudes of relocating, then, made Conner's decision an easy one. Todd Hyland had already told Conner that he was willing to move to Orlando and had offered to pay his own expenses. Since Hyland was the Senior Dispatcher in Fort Lauderdale, he had experience and training as a Dispatcher and could serve as Dispatcher in Orlando with minimal transitional problems. Furthermore, time was of the essence, since the Fort Lauderdale office was closing in less than a month. In these circumstances, Conner had no duty to consider Walker and Golub for the

12

available position.

Under *Carmichael*, an employee may be excused from the application requirement of a prima facie case "as long as he establishes that the company had some reason or duty to consider him for the post." *Carmichael*, 738 F.2d at 1133. In this case, Prudential had no duty to consider Fort Lauderdale employees for the Orlando position. Therefore, we hold that, if Conner was indeed the decision-maker, Walker and Golub have not made out a prima facie case of discrimination and, thus, have not shifted the burden to Prudential under *McDonnell Douglas*.

## 2. ADELL JONES

Regarding Adell Jones, Prudential has conceded the existence of a prima facie case. Indeed, because Prudential insists that Jones reviewed the applications of all the operations staff in Fort Lauderdale, Jones and Prudential must have been aware of the potential employees who could fill the Dispatcher position. To rebut the prima facie case, Prudential asserts that Hyland was the most qualified candidate, which is a legitimate, non-discriminatory reason for hiring Hyland. Once such a reason is articulated, Walker and Golub must overcome it by showing that the articulated reason was merely a pretext for discrimination. *See Chapman*, 229 F.3d at 1024-25.

Our pretext analysis focuses on a narrow question: Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the

decision was not the real reason? *See Chapman*, 229 F.3d at 1024; *Combs*, 106 F.3d at 1528. Walker[5] and Golub[6] contend that Prudential's articulated reason is pretextual because each of them was more qualified than Hyland and because Prudential deviated from its hiring policies. We deal with each of these arguments in turn.

a. QUALIFICATIONS

[5]Walker also claims that Prudential should have hired her for the PACES Coordinator position in Orlando. PACES is an automated claim entry system that allows Prudential's Claims Representatives to input claims directly into a central database. Walker served as PACES Coordinator for the Fort Lauderdale office. This position, however, was not a full-time position, and Walker also handled the PROFS messaging system, contested coverage, subrogation, and the phone system in Fort Lauderdale.

When the Fort Lauderdale office closed, the PACES Coordinator position in Orlando was open while its previous occupant, Cerese Van Hooven, was on maternity leave. This position remained open for six months, and Walker contends that she should have been hired to fill this position.

There are several problems with this claim. First, Van Hooven's age was not clearly established in the record. Hyland guessed that she was about 45 in 1997, but he had no foundation for this guess other than his belief that she was older than he was. Second, the PACES Coordinator position was not a full-time position. Both Walker and Van Hooven performed several other duties while serving as PACES Coordinator. This title was more of a responsibility than a position. Furthermore, Walker has not shown that the position was available or that Prudential had a pressing need to fill the position. Indeed, a mail clerk, Robert Wonderlich, was able to service the Orlando PACES system in Van Hooven's absence. In light of this evidence, Walker's ADEA claim fails.

[6]Golub also claims that Prudential should have given her an opportunity to become a Claims Representative in the Orlando office. Though Golub was not licensed to be a Claims Representative, her performance evaluations indicated that she was interested in such a position. She also claims that such positions were available in Orlando, based on the testimony of Conner that not all of the Fort Lauderdale Claims Representatives had transferred.

Golub's claims on this position fail for two reasons. First, she has not established that such positions were available. Conner testified that Meuse was moved to a Claims Representative position because one was available. However, Conner did not testify that others were available or that available positions had not been filled by other means. Second, Golub was not qualified to be a Claims Representative. She was not licensed for the position, and the mere fact that she might be willing to obtain a license is not sufficient to qualify her. Moreover, Golub was not a college graduate, a requirement for the position.

14

Walker and Golub argue that they were each more qualified than Hyland for the Dispatcher position in Orlando. To show pretext, however, Walker and Golub must show more than superior qualifications; rather, they must show that they were so much more qualified that the disparity virtually jumps off the page and slaps one in the face. *See Lee v. GTE Fla., Inc.*, 226 F.3d 1229, 1253-54 (11th Cir. 2000).

Conner informed Jones that the Dispatcher position was available on November 9. Though such a position might typically be posted, Jones needed to fill it immediately and decided to make the decision herself after first reviewing the personnel files of the operations staff. Jones reviewed the qualifications of all six of the Fort Lauderdale operations employees. She looked for someone who was trained in the position and could be productive immediately. She reviewed Golub's file and Walker's file, as well as Hyland's file. She granted no interviews. Though Jones did not remember how long the process took, she guessed that it took a week to two weeks.

Upon reviewing Golub's file, Jones would have learned that Golub had worked as a Dispatcher since December of 1990. When the Fort Lauderdale office closed, Golub would have had four years of experience as a Dispatcher. Jones also would have known that Hyland trained Golub for her dispatching position and that Golub worked as a backup Dispatcher to Hyland in the Fort Lauderdale office. On the other

hand, Jones knew that Hyland had worked as Dispatcher in Fort Lauderdale for nine years and as Senior Dispatcher for six years. Based on this information, Jones could have concluded that Hyland was more qualified than Golub.

Golub argues, however, that she was more qualified than Hyland, since the Orlando Dispatcher position involved duties that are typically associated with a Salvage Clerk, and Golub was more qualified to be a Salvage Clerk. She bases her argument on the testimony of Hyland, who described his position as "dispatcher salvage clerk." (R.2-78 at 5.) However, there is no evidence that Adell Jones knew that the Orlando Dispatcher position involved salvage duties. Her knowledge of the position came entirely from Conner's PROFS note asking for a "dispatcher." (R.4-181-Ex. C at 3.) Furthermore, as Walker testified, the salvage function was less important than the dispatching function: "What was interesting from that area is you had to be trained as a dispatcher, as a back-up dispatcher but there was no back-up training for salvage, so you knew where the importance was there, it was in dispatch." (R.1-32 at 55-56.) Jones's knowledge about the position and the candidates forecloses any inference of pretext based on the existence of extra duties.

Similarly, Jones's review of Walker's file would have revealed that Walker had served as a supervisor in the Fort Lauderdale office, a position with more responsibilities than Dispatcher. Although Walker had no experience as a Dispatcher,

she claims that she should have been allowed to downbid. But Jones testified that she wanted a person who could be immediately productive in the Dispatcher position without training. Jones estimated that such training would take about three months. As Walker herself testified, the dispatching function can be vital to a claims office: "[T]he dispatching is your life line. If you don't dispatch correctly, you don't get the cars to be seen or the homes to be seen and your claim operation kind of falls apart . . . ." (R.1-32 at 53.) Given this set of circumstances, Jones could have easily concluded that Walker was not more qualified than Hyland for the Dispatcher position.

Walker and Golub, then, were not so much more qualified than Hyland that the disparity jumps off the page and slaps one in the face. Indeed, the evidence suggests that Hyland was more qualified than Walker and Golub, since he had experience and training in the position and presently occupied it in the Fort Lauderdale office. The disparities in qualifications, then, do not suggest that Jones discriminated against Walker and Golub. *Cf. Hill v. Seaboard Coastline R.R.*, 885, F.2d 804, 810 (11th Cir. 1989) ("[A]n inference [of discrimination] is not justified where the plaintiff's qualifications are inferior to those of the nonminority employee favored by the job decision, but may be justified when the applicants' qualifications are equivalent.").

There is some evidence, however, that suggests that Jones was not as thorough

in her review as she testified.[7] In her deposition, Jones first indicated that she did not remember how long the process took. She was then asked to give her best estimate, to which she responded that "[t]he entire process probably took a week to two weeks." (R.3-130 at 46.) She again reiterated that her response was just an estimate. Hyland, on the other hand, testified that he was offered the dispatcher position "about three weeks before the closing of the office approximately" but that "I can't be exact." (R.2-78 at 10.)

Walker and Golub interpret this testimony to indicate that Hyland was offered the job on November 11, which was two days after Jones received the PROFS note from Conner. If the offer was made to Hyland on November 11, Walker and Golub argue, then it was really Conner and not Jones who made the hiring decision. If Conner really was the decision-maker, as we discussed above, there is no evidence that he discriminated against Walker and Golub because he was not aware of their existence. On the other hand, Hyland's testimony could indicate that Jones spent only two days reviewing the personnel files rather than one to two weeks. Even if Jones spent only two days reviewing the files of the six members of the operations staff, this

---

[7]Indeed, Jones could not recall some of the particular qualifications of Walker, Golub, or Hyland during her deposition. We note, however, that the deposition took place on January 21, 1998, while the decision in question took place in November of 1994. Furthermore, Jones did not have access to the personnel files immediately prior to her deposition, as they were moved to New Jersey in 1997.

18

is insufficient evidence to show that she did not base her decision on qualifications.

## b. DEVIATIONS FROM HIRING POLICIES

Walker and Golub argue that Prudential deviated from its hiring policies, thus resulting in circumstantial evidence of discrimination. The bending of established rules may, of course, be suggestive of discrimination. *See Morrison v. Booth*, 763 F.2d 1366, 1374 (11th Cir. 1985). In this case, however, Walker and Golub have not shown that Prudential departed from its usual hiring procedures.

First, Walker and Golub argue that the Orlando Dispatcher position should have been posted. However, the testimony of Tippy Rogers and Adell Jones establishes that the decision regarding whether to post a job was within the discretion of the Human Resources Department. Jones also testified that she decided not to post the job opening because the opening occurred so late in the process. Since there is no evidence regarding how long the posting process took, it is not clear whether the posting procedures could have been completed between November 9 and December 5. Based on this evidence, then, we cannot say that Jones's decision not to post the position violated a clearly established personnel policy.

Moreover, Walker and Golub cite Prudential's deviation from its affirmative action policy as evidence of pretext. Though the content of Prudential's affirmative action policy is not clearly established in the record, Walker and Golub contend that

the policy encouraged the promotion of females and minorities and that hiring a male rather than a female for the Dispatcher position violated this policy. However, as we said in *Liao v. TVA*, 867 F.2d 1366 (11th Cir. 1989), "the failure to give a preference under such a plan cannot be used to support an allegation of discrimination in employment decisions." *Id.* at 1369. Any deviation from Prudential's plan in this case does not constitute evidence of pretext.

We are left, therefore, with a single shred of evidence to support Walker and Golub's assertion of pretext, namely that Jones took two days, rather than one or two weeks, to review the personnel files of the six members of the Fort Lauderdale operations staff before deciding that the Senior Dispatcher was more qualified than the others to serve as Dispatcher in the Orlando office. This shred of evidence, without more, is insufficient to establish that Prudential's articulated reason was pretextual. Therefore, summary judgment in favor of Prudential was appropriate. *Cf. Reeves*, 530 U.S. at 148, 120 S. Ct. at 2109 ("[A]n employer would be entitled to judgment as a matter of law . . . if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.").

## B. THE DISCOVERY ORDERS

Joseph Putz, Prudential's Regional Director, and Thomas Conner, the Orlando

20

office manager, were both involved in the decision to close the Fort Lauderdale office and were both involved in other gender discrimination suits. Those suits were settled, and Walker and Golub seek access to the confidential settlement agreements and to the testimony of the individuals who brought those suits, Tippy Rogers and Karen Miklesh. The district court denied access to these agreements and to the testimony.

Under Rule 26(b)(1), "[p]arties may obtain discovery regarding any matter, not privileged, that is relevant to the claim or defense of any party . . . ." Fed. R. Civ. P. 26(b)(1). In this case, Walker and Golub seek information that is not relevant to their claims.

First, Walker and Golub seek the Putz-Rogers agreement because that case involved a claim that Putz closed an all-female office in Atlanta. They claim that such information might reveal a discriminatory animus on behalf of Putz. But Putz, though involved in the decision to close the Fort Lauderdale office, was not involved in the decision to hire Hyland for the Orlando Dispatcher position, the act for which Walker and Golub seek relief. Therefore, any information contained in the settlement agreement would not be relevant to the claims in this case, and the district court did not abuse its discretion in so finding.

Second, Walker and Golub seek the Conner-Miklesh agreement because that case involved a gender-discrimination claim against Conner. As we have seen, though,

21

even if Conner was the decision-maker, he did not know that Walker and Golub were interested in the available position. Therefore, even if Conner had a discriminatory animus against women, Walker and Golub would not have been affected by that animus in this case. The district court, then, did not abuse its discretion by denying them access to the confidential agreements.

## VI. CONCLUSION

The district court correctly granted summary judgment to Prudential. Because there is no nexus between the alleged discrimination and the evidence sought, discovery was properly denied.

AFFIRMED.

GODBOLD, Circuit Judge, dissenting:

I respectfully dissent. This court misapplies *Carmichael v. Birmingham Saw Works*, 738 F.2d 1126 (11th Cir. 1984). In reaching its conclusion that plaintiffs did not establish a prima facie case of discrimination the court relies upon the fact that the plaintiffs never applied for the dispatcher position. And, if the decision-maker is unaware of the plaintiffs' existence and possible interest then he cannot discriminate against her, therefore any presumption of discrimination is unfounded.

*Carmichael* holds that when an employer does not post an available position and instead uses informal methods, such as word of mouth, to let employees know of the position, it "has a duty to consider all those who might reasonably be interested" in the position. *Id*. at 1133. And an "employer cannot avoid a Title VII violation by showing that it incorrectly assumed that the plaintiff was uninterested in the job." *Id*. at 1133-34.

This court accepts that Prudential did not post the dispatcher's position but filled it by "rather informal methods." *Carmichael* tells us that in that situation employees are protected against an employer's "legally insufficient and illegitimate" assumption that they are disinterested in the position. *Id*. at 1134. This court takes away the *Carmichael* position by giving effect to an erroneous assumption – that because other employees are disinterested the plaintiffs must be disinterested too. This stands

23

*Carmichael* on its head.

Second, I am troubled by the court's consideration of the evidence in two discrete segments, the evidence relating to Conner and the evidence relating to Jones, as though each segment is independent of the other. A third possibility is that discrimination was the product of Conner and Jones cooperating in a decision to employ Hyland that was not based upon his being "better qualified."

On November 9 Conner transmitted this message to Jones:

> Joe [Putz] and I have reevaluated our staffing needs here in Orlando. We will be contacting all 9 individuals who posted to determine their qualifications for the needed positions. I will let you know which individuals we select.
>
> I will need a dispatcher in Orlando to backfill my current dispatcher who will be moving into M/L claims. May we contact Todd Hyland in S. Fla. and offer him this position in Orlando? Todd has all the skills needed for this job.

This is more than a notice of a vacancy and a request that it be filled. It is a request that a particular employee be chosen, a recommendation of that person's skills, and a request for actions.

Jones then examined personnel files. This court acknowledges that her testimony about her examination is flawed. She testified that she could not recall how long the process took, when asked to give her estimate she responded that it "probably took a week to two weeks," but it was just an estimate. In its footnote 7 the court

24

points out other matters that Jones could not recall but excuses this with its statement that she did not have access to the files immediately prior to her deposition.

The evidence of time is disquieting. Hyland testified that he was offered the dispatcher position "about three weeks before the closing of the office approximately," but that he could not be exact. The office was closed on December 2. Three weeks prior to that date would be on or about November 9, which was the date on which Conners' message to Jones asked that Hyland be selected and recommended him for his skills. Under all the evidence a factfinder might conclude that Jones received Conner's request, took a look at the files, and notified Hyland that he could have the job, that is that Rogers selected Hyland not on the basis of "better qualified" but as a response to Conners' in-house request that Hyland be chosen.