[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 15-15348
Non-Argument Calendar

_____

D.C. Docket No. 4:14-cv-00626-RH-CAS

PAUL H. ZARZA,

Plaintiff - Appellant,

versus

TALLAHASSEE HOUSING AUTHORITITY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(April 26, 2017)

Before MARCUS, JORDAN, and JULIE CARNES, Circuit Judges.

PER CURIAM:

Plaintiff Paul Zarza ("Plaintiff") appeals the district court's order granting

summary judgment to Defendant Tallahassee Housing Authority ("Defendant") on

his hostile work environment, constructive discharge, and retaliation claims under

Title VII of the Civil Rights Act and the Florida Civil Rights Act.[1]  Concluding that Plaintiff has not shown that the harassment he endured was sufficiently severe or pervasive, we affirm the district court's grant of summary judgment.

## I.  BACKGROUND

### A.  Factual Background

Defendant is a public housing agency that operates three properties: Springfield Apartments, Pinewood Place, and Orange Ave Apartments.  Plaintiff, who is white, began working for Defendant in 2003 as a Work Order Specialist, where he was responsible for responding to work order requests for these properties, which consist of approximately 600 units.  While employed in this capacity, Plaintiff used his work truck as an office to complete any necessary paperwork.  As a result of a structural reorganization in 2011, Plaintiff became the maintenance supervisor for Springfield Apartments only.  In his new position, Plaintiff had six employees reporting directly to him, as well as increased responsibility and more paperwork, even though he was responsible for fewer units overall.

Around the same time, Plaintiff began renovating three existing apartment units used as offices into a single suite of offices, which also included adding

---

[1]  Plaintiff's state law claims do not require separate discussion because the FCRA is modeled after Title VII and the same framework is used to analyze these claims.  *See Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253, 1271 (11th Cir. 2010).

cubicles for some staff members.  Plaintiff began using one of the offices in the newly renovated space for several months, though the property manager at the time, Joan Doby, who is African-American, asked Plaintiff to vacate the office so that Wilford Evans could use the office.  Evans, who is also African-American, was the assistant property manager at the time.  Plaintiff occupied the other vacant office space for a few more months, until Doby asked Plaintiff to vacate the office for another African-American employee, Larry Simmons, who was not part of the maintenance organization.  Plaintiff claims Doby denied him permission to build a cubicle for himself and told him to work at the breakroom table instead.  Doby claims she only denied Plaintiff permission to build a cubicle in the breakroom itself.  Plaintiff found the breakroom table too small and the environment too noisy, and he was frustrated by having to store his work in a closet every day.  Plaintiff was able to use a small surplus table in the breakroom for the eight months immediately preceding his resignation.  At the two other properties, the maintenance supervisors, who were African-American, had offices.

Evans had been the assistant property manager at Springfield Apartments since 2007.  According to Plaintiff, Evans was "extremely hostile and rude" to him the entire time they worked together, and Evans was particularly combative toward white employees.  When communicating his problems with Evans to Doby and Brenda Williams, who is African-American and who was Defendant's Executive

3

Director, Plaintiff claims that these two threatened him with termination if he could not work out his differences with Evans. In 2012, Plaintiff asked Doby and Williams to be transferred to the maintenance supervisor position at the Pinewood property.[2] According to Plaintiff, they refused the transfer, and Williams told Plaintiff he could quit if he wanted. Plaintiff acknowledges that he never formally applied for the position.

By June 2012, Evans replaced Doby as property manager of Springfield Apartments. According to Plaintiff, at the first meeting that Evans led as property manager, Evans demanded that Plaintiff lower an employee evaluation Plaintiff had given to Randall Day, one of his white employees. Even though Plaintiff told Evans he did not agree with the lowered evaluation, Evans told Plaintiff he would be fired if he did not comply.[3]

The same day, Evans reassigned the truck Plaintiff had used for four years to Paul Robinson, an African-American employee who was Plaintiff's subordinate and who already had a truck assigned to him. Evans claimed the reassignment was to ensure that Robinson had a safe truck to use when he was on call during late-

---

[2] Williams and Doby claim that Plaintiff never asked for a transfer to Pinewood, and according to Doby, the position was not open at the time Plaintiff allegedly made his transfer request.

[3] Evans testified that he did not order Plaintiff to change the evaluation, but merely told him he had the option to change it.

night hours.[4] Plaintiff was told he had to "walk the grounds" to perform his work on the property's 200 units. Although Plaintiff had other unassigned vehicles available to him, he alleges he was not informed that he was able to use them. Plaintiff used his own vehicle for about a month, until Plaintiff "got tired of spending [his] own money driving around the property." Plaintiff eventually began to use a small station wagon when Simmons was not using it, though Plaintiff said Evans was visibly displeased when Plaintiff used the station wagon. The station wagon was too small to carry many of the tools and supplies that Plaintiff needed to transport, and it was part of his job to travel off the premises to buy supplies.

Evans gave Plaintiff several written warnings that Plaintiff asserts were unmerited. In May 2012, Evans wrote up Plaintiff for failing to follow verbal instructions to price a range hood, stock a van with supplies, and install a refrigerator, as well as to contact an A/C contractor. Plaintiff disagrees that he failed to fulfill these responsibilities. Evans also wrote up Plaintiff for refusing to lower Day's employee evaluation and for driving his personal truck to perform job duties. Plaintiff is the only employee that Evans gave written warnings to.

Plaintiff believes that Evans wanted Robinson to have Plaintiff's position and so was trying to force Plaintiff to quit. Plaintiff alleges that Robinson also

---

[4] According to Evans, Robinson's truck was in need of repairs, including new tires, and he had asked Plaintiff to make the necessary repairs.

5

understood this to be true, and Robinson related to Plaintiff that he used the word "cracker" in an argument with another employee, but was only suspended for three days. Plaintiff also alleges that Evans would reassign worker assignments made by Plaintiff without discussion or explanation solely to make Plaintiff look incompetent.

On June 28, 2012, Plaintiff took his frustrations to Laura Detsch, who was Defendant's Deputy Director and who is white. Plaintiff said that he recounted to Detsch Evans's hostility toward him and his belief that Evans treated Plaintiff poorly because Plaintiff was white. Plaintiff states that he tried to submit to Detsch a letter of resignation, stating that Evans's hostile treatment was too much for him to handle. The resignation letter did not express Plaintiff's belief that the hostility was based on his race. Plaintiff claims that Detsch told him she would bring his complaints to Williams, though there is no evidence that this occurred.

Sometime after making the report, Williams arranged for Plaintiff and Evans to attend mediation, although it was unsuccessful. Evans issued Plaintiff a written warning on September 19, 2012, for violating company policies. Plaintiff does not recall what this reprimand was for. Plaintiff believed it was clear that Evans was manufacturing the write-ups required before an employee could be justifiably terminated. Plaintiff testified that at a maintenance staff meeting on September 26, 2012, Evans was demeaning, embarrassing, and hostile to Plaintiff. Plaintiff

6

submitted a letter of resignation later that day, noting that the workplace had become too hostile for him "to work in and still respect [himself] and [his] superiors."

## B. Procedural History

Plaintiff sued Defendant in Florida state court under Title VII, which makes it unlawful for an employer to discriminate against an employee because of race. 42 U.S.C. § 2000e-2(a)(1). Specifically, Plaintiff alleges claims of a hostile work environment, constructive discharge, and retaliation. Plaintiff argues that the denial of office space and of his requested transfer to Pinewood, the reassignment of his truck, and Evans's hostility toward him were all because he was white. These acts, according to Plaintiff, created a hostile work environment, leading to his constructive discharge.

Defendant removed the case to federal court and eventually moved for summary judgment. In a hearing on the motion, the district court noted that the harassment alleged by Plaintiff was not sufficiently severe or pervasive to satisfy the standard for a hostile work environment or for a constructive discharge, and that there was no evidence that a decision-maker knew about Plaintiff's race-based complaints, which is required to support a claim of retaliation. The district court accordingly granted Defendant's motion and entered judgment against Plaintiff.

7

## II.  DISCUSSION

### A.  Standard of Review

We review an entry of summary judgment *de novo*, construing all facts and drawing all reasonable inferences in favor of the nonmoving party.  *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1291–92 (11th Cir. 2012).  A movant is entitled to summary judgment if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A dispute about a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### B.  Hostile Work Environment Claim

A plaintiff seeking to establish a hostile work environment claim must show his membership in a protected group, that he has been subject to unwelcome harassment based on a protected characteristic, that the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," and that the employer is responsible for that environment.  *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).  Determining whether harassment is "sufficiently severe or pervasive" involves both a subjective and an objective inquiry.  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22 (1993).  When considering the objective

8

inquiry, relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. The objective severity of the harassment is considered by looking at all of the circumstances. *Id.*

For example, in *Miller v. Kenworth of Dothan, Inc.*, this Court concluded that severe and pervasive conditions existed where the plaintiff was called ethnically offensive names three to four times per day and was required to interact with the person expressing the slurs. 277 F.3d 1269, 1273, 1276–77 (11th Cir. 2002). We noted that "it is repeated incidents of verbal harassment that continue despite the employee's objections [that] are indicative of a hostile work environment and not simply some magic number of racial or ethnic insults." *Id.* at 1276 (quotation marks omitted) (alteration in original). In contrast, we noted that racially derogatory language was "too sporadic and isolated" to show that harassment was sufficiently severe or pervasive when, over the course of more than two years, only once was a racially insensitive remark was directed toward the plaintiff, and only once was such a remark otherwise used in her presence. *McCann v. Tillman*, 526 F.3d 1370, 1379 (11th Cir. 2008). Harsher racial epithets were never directed toward the plaintiff or used in her presence. *Id.*; *see also Harris*, 510 U.S. at 21 (finding that the "mere utterance of an . . . epithet which

9

engenders offensive feelings in a[n] employee . . . does not sufficiently affect the conditions of employment to implicate Title VII.") (internal quotation marks omitted).

Similarly, while "simple teasing, offhand comments, and isolated incidents (unless extremely serious)" do not rise to the level of a hostile work environment under Title VII, *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotation marks omitted), we found that a plaintiff who had endured seven incidents of racially-hostile acts escalating over a year—four of which occurred during the plaintiff's last two weeks of employment and included a "possibly threatening confrontation"—created a jury question on whether there was a hostile work environment. *Jones*, 683 F.3d at 1303–04.

Accepting Plaintiff's allegations as true, we will assume that he has shown that his immediate superiors, particularly Evans, did not treat him with the same respect and consideration that these superiors treated Plaintiff's black counterparts. According to Plaintiff, Evans was petty and went out of his way to annoy Plaintiff. But the problem for Plaintiff in succeeding on his claim is the requirement that the hostility be severe and pervasive to have altered the terms and conditions of his employment. Based on the applicable standards we use in deciding such claims, we agree with the district court that Plaintiff has not shown that the mistreatment

10

he faced in his work environment was sufficiently severe or pervasive to sustain a claim for a hostile work environment.

While lack of a designated truck and office space certainly made it more difficult for Plaintiff to do his job, he was still able to perform his job. Plaintiff had access to other pool vehicles, and he does not point to any specific projects or assignments he was unable to complete because he did not have a vehicle assigned to him. Plaintiff was also able to complete his paperwork in the breakroom—he had completed paperwork without an office at all prior to becoming maintenance supervisor—and the only problems with this arrangement were loud noises and distractions and having to reorganize his work every day.

As to any overtly racially-hostile conduct, Plaintiff was not subjected to this kind of conduct. The only evidence in the record of a racial insult among employees—Robinson's "cracker" remark—was not directed at Plaintiff, and the speaker was punished. Plaintiff points to only a few specific acts to demonstrate the hostile work environment. For example, the reprimand for refusing to lower Day's employment evaluation was a single event. (Nor has Plaintiff spelled out with enough specificity the reasons why his supervisor was wrong to make this request.) Plaintiff was not subjected to racially pejorative remarks multiple times a day, every day, as the plaintiff in *Miller*. Nor was Plaintiff ever physically threatened like the plaintiff in *Jones*. In sum, while Plaintiff's working conditions

11

may have been unpleasant, and his supervisor may have been an unfair and unkind boss, Plaintiff has not shown that he faced the objectively severe or pervasive harassment necessary to sustain a hostile work environment claim.

## C.  Constructive Discharge Claim

Constructive discharge occurs when an employer deliberately makes an employee's working conditions so unbearable that a reasonable person in that position would be compelled to resign.  *Bryant v. Jones*, 575 F.3d 1281, 1298 (11th Cir. 2009).  Establishing this claim requires demonstrating an even greater severity or pervasiveness of harassment than is required for a hostile work environment claim.  *Id.* at 1298–99.  Because Plaintiff has not shown that the mistreatment directed toward him rose to the level necessary to sustain a hostile work environment claim, his constructive discharge claim also fails.

## D.  Retaliation Claim

Title VII makes it "an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]."  42 U.S.C. § 2000e-3(a). An employee alleging retaliation must demonstrate a *prima facie* case of retaliation, which requires showing that:  (1) the employee engaged in a statutorily protected activity; (2) the employee suffered a materially adverse employment action; and (3) there is a causal connection between the protected activity and the

12

adverse action.  *Brown v. Ala. Dep't of Transp.*, 597 F.3d 1160, 1181 (11th Cir. 2010).

In this case, the district court indicated in its oral ruling that Plaintiff had "pretty much [given] up" his retaliation claim during argument before the court, but the court nevertheless considered the claim and deemed it deficient.  First, the district court agreed that Plaintiff engaged in protected activity during his meeting on June 28 with Detsch, in which Plaintiff reported to Detsch his belief that Evans's harassment and unfair treatment towards him were racially motivated. *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 400 (11th Cir. 1989) ("[T]he protection afforded by [Title VII] is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employers' internal grievance procedures.").  We agree.

Nevertheless, the district court concluded that Plaintiff had not demonstrated the causal connection between this protected activity and a materially adverse employment action, as required by the third element.  The district court further noted its doubt that Plaintiff had even suffered a materially adverse employment action after taking his complaint to Detsch, but it did not decide this question because it concluded that the complaint failed anyway on the causation element. We agree that Plaintiff has failed to sustain his retaliation claim, but we conclude

13

that, in addition to the causation prong, the absence of a materially adverse employment action likewise supports this conclusion.

As to the requirement that a plaintiff show causation, this Court "construe[s] the causal link element broadly so that 'a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.'" *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1278 (11th Cir. 2008) (quoting *Olmsted v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir.1998)). "The burden of causation can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). Because demonstrating temporal proximity is ultimately about showing that a decision maker was aware of the protected conduct at the time of the adverse action, "temporal proximity alone is insufficient . . . where there is unrebutted evidence that the decision maker did not have knowledge that the employee engaged in protected conduct." *Brungart v. BellSouth Telecomms., Inc.*, 231 F.3d 791, 799 (11th Cir. 2000) ("A decision maker cannot have been motivated to retaliate by something unknown to him.").[5]

Defendant argues, and the district court concurred, that although Plaintiff made his complaint to Detsch, there is no evidence that Williams, the "decision-

---

[5] Though *Brungart* concerns retaliation under the Family and Medical Leave Act (FMLA), this Court has noted that FMLA and Title VII retaliation are analyzed under the same standards.

14

maker," ever learned of the complaint.  Plaintiff did not testify that he made the same complaint to Williams.  Detsch testified that she did not pass Plaintiff's race-based complaint or letter of resignation along to Williams, and Williams testified that she never learned of any race-based complaints from Plaintiff.  Even if Williams had received the resignation letter that Plaintiff attempted to give to Detsch, the letter itself does not indicate Plaintiff's resignation was based on racial hostility.

Rather, Plaintiff attempts to show that Williams had constructive knowledge of his complaint of race-based hostility, which allows him to impute retaliatory intent to her.  Yet as this Court has noted, discrimination and retaliation under Title VII concerns "actual knowledge, and real intent, not constructive knowledge and assumed intent," which means "we must focus on the actual knowledge and actions of the decision-maker." *See Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274 (11th Cir. 2002) (discussing the establishment of a *prima facie* case for discrimination under Title VII).  Thus, without evidence of Williams's actual knowledge of Plaintiff's complaint of race-based hostility, Plaintiff cannot satisfy the causation element of a *prima facie* case for retaliation, and his claim accordingly fails.

But even assuming that Williams, who was Defendant's Executive Director, was aware that, in complaining to Detsch about his unfair treatment by Evans,

15

Plaintiff had characterized Evans's conduct as racially motivated, Plaintiff's claim still fails.  A major problem with Plaintiff's claim is his failure to identify any decision that Williams subsequently made about which Plaintiff is complaining or to explain how any such decision would constitute a materially adverse employment action.  In this Circuit, a materially adverse employment action is one that "might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *See Crawford v. Carroll*, 529 F.3d 961, 974 (11th Cir. 2008) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006)).  This is an objective inquiry, and a lack of good manners, personality conflicts, petty slights, or minor annoyances do not suffice.  *See Burlington*, 548 U.S. at 68.

Plaintiff complains that after his meeting with Detsch, Williams arranged for Plaintiff and Evans to attend a mediation to try to work out their problems.  But a mediation between an employee and his immediate supervisor is hardly an adverse action, and it is not even clear that Plaintiff is saying that it was.  So, Plaintiff has failed to identify any adverse consequences visited on him by Williams after Plaintiff's meeting with Detsch on June 28, 2012.

It is true that Plaintiff contends that Evans continued to write him up for violations, and Plaintiff contends that these write-ups were unmerited.  But Evans had been consistently rude to and critical of Plaintiff, and had written him up in the

16

past, so Evans' conduct was just more of the same in the long pattern of his and Plaintiff's unharmonious relationship. A causative link between Plaintiff's comment to Detsch and Evans's subsequent conduct is difficult to discern.

More fundamentally, Plaintiff did not complain in his lawsuit that any particular write-up by Evans was a materially adverse act for purposes of his discrimination claim. Had he done so, and had he offered more than just the general and conclusory allegations about those acts that is present in the record, we could examine such a claim and adjudicate whether Plaintiff had produced evidence from which a jury could conclude that Defendant, through Evans, visited these acts on Plaintiff out of a racially-discriminatory motive. Instead, however, Plaintiff's discrimination claim is based on his argument that because conditions were so unpleasant for him at his job, he was forced to resign and this resignation should be treated as a constructive discharge. And that claim circles us back to our earlier analysis: which is that although Evans, as Plaintiff's supervisor, may have treated Plaintiff harshly and even unfairly, Evans's treatment of Plaintiff was not severe enough to warrant a characterization of Plaintiff's decision to resign as a constructive discharge.

In short, we conclude that the district court correctly granted summary judgment to Defendant on the retaliation claim.

17

## III.  CONCLUSION

Because Plaintiff has not shown that his working conditions demonstrated severe or pervasive harassment for purposes of his race discrimination claim and because he has failed to meet the requirements set out for a retaliation claim, we **AFFIRM** the district court's order granting summary judgment in favor of Defendant.

18