EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
Plaintiff,

v.

COMCAST OF GEORGIA,
INC., Defendant.

Civil Action No. 1:06–CV–2595–TWT.

United States District Court,
N.D. Georgia,
Atlanta Division.

May 14, 2008.

Robert K. Dawkins, Suzanne Julia Carelli, Equal Employment Opportunity Com-

mission, Atlanta District Office–Legal Unit, Atlanta, GA, for Plaintiff.

Robert P. Foster, James Melvin Hux, Jr., Fisher & Phillips, LLP, Atlanta, GA, for Defendant.

## ORDER

THOMAS W. THRASH, JR., District Judge.

This is a puzzling case. The EEOC sues on behalf of a current employee of the Defendant alleging that he was the victim of age and sex discrimination for one of the forty or so positions that he applied for after he was laid off due to a reduction in force. The position was filled in May 2005 by a younger female employee. The alleged victim was hired by another cable company in October 2005, a year before the EEOC filed this lawsuit. Within a few months, that cable company was taken over by Comcast and the alleged victim has been employed by Comcast—with no complaints of discrimination—ever since. So this action is now about five months of unemployment. When the alleged victim was laid off, he received severance benefits of about $35,000.00. The case is before the Court on the Report and Recommendation [Doc. 61] of the Magistrate Judge recommending that the Defendant's Motion for Summary Judgment [Doc. 40] be granted. The forty-one pages of Objections by the EEOC to the Report and Recommendation are without merit. The Defendant's hiring manager understandably thought that the alleged victim would not be happy with a fifty mile commute between Acworth and Rome for a salary that was half of what he had previously made. This was a legitimate nondiscriminatory reason not to offer him the Rome position. The EEOC has abandoned its administrative claim that the alleged victim was discriminated against when he applied for the forty or so other positions during the brief period when he was laid off. The Court approves and adopts the Report and Recommendation as the judgment of the Court. The Defendant's Motion for Summary Judgment [Doc. 40] is GRANTED.

SO ORDERED.

## FINAL REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

E. CLAYTON SCOFIELD, III, United States Magistrate Judge.

## I.

### Introduction

Plaintiff, the Equal Employment Opportunity Commission, filed the instant employment discrimination action against Defendant, Comcast of Georgia, Inc., on behalf of a Defendant employee, Ray Roper ("Roper"). [Doc. 1]. Plaintiff's complaint asserts sex discrimination under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq., and age discrimination under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 ("ADEA"), for Defendant's failure to hire Roper as a cable dispatcher during a period from November 2004 to October 2005. This matter is presently before the Court on Defendant's motion for summary judgment on all claims of Plaintiff's complaint. [Doc. 40]. For the reasons expressed herein, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED**.

## II.

### Factual Background

When evaluating the merits of a motion for summary judgment, the Court must view the evidence and factual inferences in a light most favorable to the non-moving party. *Frederick v. Sprint/United Mgmt.*

*Co.,* 246 F.3d 1305, 1309 (11th Cir.2001); *Hairston v. Gainesville Sun Publ'g. Co.,* 9 F.3d 913, 920 (11th Cir.1993). Applying this legal standard, the Court derives the following facts from the parties' statements of facts and the record as a whole:

Ray Roper, a 57-year-old male, worked for Comcast and its predecessor companies for 19 years, from 1985 until 2004. (Def's SMF ¶ 1). In 1996, Roper became a cable dispatcher. (Exh. 17) [Doc. 46]. In 2001, Roper was promoted to the position of CLI Coordinator. (Pl's SMF ¶ 3). After approximately one year, he was promoted to Safety and Compliance Inspector. (Pl's SMF ¶ 3). In October 2004, he was notified that his position was being eliminated in November 2004 as part of a reduction in force. (Def's SMF ¶¶ 1, 6). Roper never made any claims of discrimination of any kind related to those 19 years of employment. (Def's SMF ¶ 2).

On October 24, 2005, almost a year after his Comcast position was eliminated, Roper was hired by Adelphia Communications as a dispatcher. (Def's SMF ¶¶ 8–9). In 2006, Roper's Adelphia facility was acquired by Comcast, and Plaintiff became a Comcast employee again. (Def's SMF ¶ 10). Plaintiff is presently a Comcast employee. Plaintiff's claims therefore pertain to Defendant's failure to rehire Roper during the one-year period between his November 2004 discharge and his October 2005 hiring by Adelphia. (Def's SMF ¶ 5).

Between Roper's official separation from Comcast and his hiring by Adelphia, Roper applied for approximately 40 job openings at Comcast. (Def's SMF ¶ 11). Of these 40 applications, the four at issue in Plaintiff's complaint are for dispatcher positions in Rome, Georgia; Tucker, Georgia; Panama City, Florida; and Jonesboro, Georgia. (Def's SMF ¶ 13). In his response to Defendant's motion for summary judgment, Plaintiff only addressed the Rome, Georgia, and Jonesboro, Georgia, positions.

*See* (Pl. Response Br. 11–30)[Doc. 46]. Furthermore, there is no evidence of discrimination in the hiring process at Tucker, Georgia, or Panama City, Florida, on the record herein. Accordingly, the undersigned **RECOMMENDS** that summary judgment be **GRANTED** as to Plaintiff's claims regarding the Tucker, Georgia, and Panama City, Florida, cable dispatcher positions.

### A. Application Process

When an opening occurs at Comcast, the position is posted, and both existing Comcast employees and external candidates may apply. (Def's SMF ¶ 15). Internal candidates who apply for a transfer to the position through Comcast's employee portal, Team Comcast, are electronically routed to one electronic folder, while external candidates, who apply through comcast.com, are routed to a separate electronic folder. (Def's SMF ¶ 16). Applications from internal transfer candidates who meet the minimum qualifications for the position are generally forwarded to the hiring manager first by the recruiter. (Def's SMF ¶ 17). Such transfer candidates are typically given an opportunity to interview for the position. (Def's SMF ¶ 17). If no suitable candidate is found from among the internal candidates, or if more resumés are desired, then resumés of external candidates can be requested from the recruiter. (Def's SMF ¶ 18). During the time period relevant to this case, Stan Thomas, a Comcast human resources director, was required to approve all hiring decisions. (Fincher Dep. 42–43).

### B. Rome Position

Before Roper's position with Comcast was eliminated in November of 2004, he applied for the Rome dispatch position as an internal candidate and submitted a transfer request. (Def's SMF ¶¶ 19, 20).

The resumé Roper submitted stated that he had worked for Comcast as a customer service representative, a cable installer, a cable technician, a cable dispatcher, a CLI coordinator, and a safety and compliance officer. (Exh. 22) [Doc. 6]. The resumé did not, however, indicate when or for how long Roper had held these jobs, beyond showing that they had all fallen between 1985 and 2004. *Id.* Roper also provided letters of recommendation from other Comcast employees. (Smith Dep. at 55). Because Roper was an internal transfer candidate, his application was routed automatically to the requisition folder and then sent to the hiring manager. (Def's SMF ¶ 21).

### 1. *The Interview*

The hiring manager for the Rome position was Wanda Smith, a dispatch manager, who interviewed Roper for the dispatch position. (Smith Dep. at 69–70). Glenda Fincher, Comcast's human resources manager, was also present during about ten minutes of Roper's 30 or 40 minute interview. (Fincher. Dep. at 25); (Smith Dep. at 70). Fincher came into the interview in order to answer questions about benefits. (Fincher Dep. at 95–96).

Roper testified that, during the interview, Smith asked him about his dispatch experience. (Roper Dep. at 89). Roper told her he was familiar with CSG and Cable Data, two different software programs that dispatchers use to store customer files, input orders, arrange routing, and assign work to technicians. (Roper Dep. at 86); (Smith Dep. at 43, 48, 76–77). Roper testified that Smith asked him about his 50–mile commute to Rome, and he responded that he had no problem commuting. (Roper Dep. at 88). Roper also

testified that Smith told him that the starting salary in Rome was lower than in the Atlanta market, and he told her he could work for less. (Roper Dep. at 87). Smith testified that she did not know how old Roper was, but she guessed from the interview that he was "probably around my age . . . in his early fifties." (Smith Dep. at 74).

Roper also testified that, during his interview with Smith, Smith asked him, "Do you have any problem working with women? All I have is women." (Pl's SMF ¶ 8). Roper further testified that, when Smith showed him the Rome dispatch department, she said, "This is where my girls sit." (Pl's SMF ¶ 8).

### 2. *The Other Candidate, Rachel Myers*

Rachel Myers, a 26–year–old female, was also interviewed for the Rome dispatch position. (Myers Dep. at 6). Rachel Myers's resumé reflected dispatch experience with Sears from 1997 to 2003. (Smith Dep. 102); (Exh. 11) [Doc. 40]. Her application stated, "Eight years dispatching experience, customer service, promoted to Route Specialist Jan. 2000." (Exh. 13 at 3) [Doc. 46]. Myers, however, testified that she only worked in Sears's dispatch department for four years, until 2001, and that she worked in customer service from 2002 until she left Sears in 2003.[1] (Myers Dep. at 18). Myers had not used Cable Data or CSG software as a dispatcher for Sears. (Myers Dep. at 24–25, 28–30). Myers's 2004 job, her most recent job before her interview, was with Precision Heating and Air. (Exh. 13)[Doc. 46]. Although Myers did not do dispatching at Precision Heating and Air, she sent technicians out on job calls, and she stayed in

---

1. Looking at Myers's resumé during her deposition, Smith testified that the resumé reflected that Myers had six years' experience. (Smith Dep. at 102). At an earlier point, six months after hiring Myers, Smith emailed Stan Thomas and told him that Myers had three years' experience. (Exh. 7)[Doc. 46].

radio contact with them for the purpose of sending them on to their next jobs. (Myers Dep. at 11, 17).

At the time of her interview, Myers did not know anything about cable except as a consumer. (Myers Dep. at 39). She testified that when she started the job she was "completely clueless" when asked questions, but that she learned over time about cable packages, different box types and costs, upgrade costs, and the construction involved in cutting new taps for new customers. (Myers Dep. at 40).

During Myers's interview, unlike Roper's, Fincher was present the entire time. (Myers Dep. 43); (Smith Dep. 100). Myers was also introduced to three other dispatchers during her interview. (Myers Dep. 49–50).

### 3. *The Rome Decision*

Fincher testified that both she and Smith thought Roper was qualified for the job because of his prior dispatch experience. (Fincher Dep. at 52, 54–55). Fincher testified, however, that when she and Smith discussed Roper after the interview, they felt he was not someone they wanted to hire. (Fincher Dep. at 57). Both Smith and Fincher testified that they were concerned that Roper was more interested in maintaining his Comcast benefits than in the dispatch job itself. (Smith Dep. at 73–74); (Fincher Dep. at 58). Fincher testified that all his questions were about his benefits. (Fincher Dep. at 58). Fincher further testified that Roper's demeanor during the interview was not very good, he was not dressed appropriately, and his shirt was hanging out. (Fincher Dep. at 57, 61, 63). Smith testified, however, that Roper did not say or do anything to indicate he was uninterested in the job. (Smith Dep. at 74).

Fincher also testified that she was concerned that Roper had been a Safety and Compliance Officer, rather than a dispatcher, for the past several years. (Fincher Dep. at 59). As a Safety and Compliance Officer, he earned $17.50 an hour and was able to travel. (Fincher Dep. at 59, 62); (Def's SMF ¶ 36). Rome's dispatch position was an entry level desk job with a lower wage rate, between $8 and $10 an hour. (Fincher Dep. at 59, 62, 79); (Def's SMF ¶ 36). Fincher testified that, although Roper might have said that taking an entry level position did not bother him, she "had that happen before and it has not worked out." (Fincher Dep. at 64–65).

Smith testified that when she talked to Roper about his salary and how they would not be able to offer what he had formerly earned at Comcast, he stated that the amount she quoted—which was more than she ultimately offered Myers—would not be a problem. (Smith Dep. at 88–90). Smith testified that she believed him when he said it would not be a problem. (Smith Dep. at 91). Fincher testified that, in her experience, regardless of what a candidate said, it was difficult to go from making $16 or $17 an hour to $9 or $10. (Fincher Dep. 111). Myers asked for $11 an hour in her application, and she accepted the job at $9 an hour. (Smith Dep. at 92–93).

Fincher testified that she was concerned about the distance from Roper's home in Acworth to Rome. (Fincher Dep. at 99). She testified that Acworth was farther away than Rockmart, where Myers lived. (Fincher Dep. at 101). Smith testified that she did not have any concerns with Roper's distance from Rome. (Smith Dep. at 99). Smith also testified, however, that Myers's dispatch experience with routing technicians in areas the Rome dispatchers would be covering, such as Dallas, Hiram, and Paulding County, was advantageous. (Smith Dep. at 101–04). Smith testified that the fact that Myers lived 30 minutes from Rome had also led her to presume,

without asking, that Myers had some familiarity with the Rome area. (Smith Dep. at 107).

Fincher testified that Myers seemed interested in the job, asked questions about the company, and presented herself well. (Fincher Dep. at 84, 85). She testified that Myers had been out of dispatch for less than a year. (Fincher Dep. at 84). Smith testified that she gathered from Myers's interview and job experience that Myers could handle talking to customers and dealing with irate customers. (Smith Dep. at 105–06). Smith also testified that she considered the fact that Myers had more recent experience dealing with customers and technicians an advantage. (Smith Dep. at 110–11). Smith testified that Rome dispatchers needed to speak to customers on a daily basis. (Smith Dep. at 105).

Smith and Fincher submitted a personnel action notification ("PAN") form recommending to Stan Thomas that Myers be hired, and Myers began working as a dispatcher in May 2005. (Fincher Dep. at 42–43); (Myers Dep. at 12).

Smith and Fincher both testified that, at the time of Roper's interview and Myers's hiring, they were members of the organization Women in Cable Telecommunications ("WICT"). (Smith Dep. at 8); (Fincher Dep. at 11). WICT's goal is to develop and advance women leaders in the cable industry. (Exh. 21)[Doc. 46]. Women and men can belong to the organization. (Smith Dep. at 9). Neither Smith nor Fincher were active members; Smith did not attend meetings, and Fincher only ever attended one. (Smith Dep. at 8); (Fincher Dep. at 11). Twenty-one out of the twenty-four people Smith hired at Comcast were female, and twenty-one out of the twenty-four were in their twenties and thirties rather than in their forties or fifties. (Smith Dep. 24–36). The men she had hired included at least one Rome dispatcher, Ronnie Branton, whose transfer created the vacancy Myers filled. (Smith Dep. at 30–31); (Exh. 2)[Doc. 40].

## C. Jonesboro Position

Roper applied as an external candidate for the Jonesboro dispatcher position, since he was no longer employed with Comcest at the time he applied. (Def's SMF ¶ 19). Roper testified that he thought he interviewed in Jonesboro with an individual named "Vanessa," but he stated that he "was not 100% sure." (Roper Dep. at 68).[2] Vanessa Price, the hiring manager for the Jonesboro position, testified she does not recall if she ever interviewed Roper or even if she ever saw his resumé. (Price Dep. at 30); (Def's SMF ¶ 51). Price hired a female internal transfer candidate, Latrice Adams. (Price Dep. at 15); (Exh. 13–14)[Doc. 40]. Price testified that Adams was the most qualified applicant for the position because she had spent the immediate three years prior to applying working as a Comcast customer account executive lead, performing many of the most challenging duties performed by dispatchers. (Price Aff. ¶ 4)[Doc. 40].

Stan Thomas had the power to overrule hiring recommendations. (Fincher Dep. 42–43). Fincher testified that, at some point, she might have told Stan Thomas that she did not think Roper was a good candidate because of his lack of interest in the position. (Fincher Dep. at 122–24). Price testified that on two prior occasions Stan Thomas had overruled her first choice regarding who to hire, but neither

---

**2.** Defendant's senior recruiter, Lori Ranson, testified that she did not review or send the external candidate applications to the hiring manager for the Jonesboro dispatcher opening. (Ranson Aff. ¶ 3) [Doc. 40]. On Defendant's motion for summary judgment, however, the facts are taken in the light most favorable to Plaintiff.

of those occasions involved Roper. (Price Dep. at 44–45).

Ray Roper filed his charge of discrimination with the E.E.O.C on March 29, 2005. (Exh. 1) [Doc. 40]. On January 18, 2006, the E.E.O.C. issued a determination that there was evidence of discrimination. *Id.*

## III.

### *Summary Judgment Standard*

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(C); *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1432 (11th Cir.1998). A factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *United ed States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir.1991)(en banc)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). The substantive law applicable to the case determines which facts are material. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

The moving party bears the initial burden of showing the court "the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact" and "an absence of evidence to support the non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–323, 106 S.Ct. 2548, 2552–54, 91 L.Ed.2d 265 (1986); *Four Parcels*, 941 F.2d at 1437–1438. If the moving party fails to discharge this initial burden, then the motion must be denied. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993)(citing *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991)). If the burden is met, however,

the non-moving party must then "go beyond the pleadings and ... designate specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(e)).

## IV.

### *Discussion*

A. **The Law Applicable to Plaintiff's Title VII and ADEA Claims**

Title VII makes it unlawful for an employer to discriminate by refusing "to hire ... any individual [ ] because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). The ADEA, which protects individuals between the ages of 40 and 70, makes it unlawful for an employer "to discharge ... or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age ..." 29 U.S.C. § 623(a).

The Eleventh Circuit has applied the principles governing the order and allocation of proof in Title VII actions to claims of age discrimination. *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir.1993). Therefore, the following burden-shifting analysis will be equally applicable to Plaintiff's Title VII and ADEA claims.

In a Title VII action, a plaintiff may establish a prima facie case of discrimination by presenting either direct or circumstantial evidence of discriminatory intent. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973); *accord Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989). When, as in this case, direct evidence of discriminatory intent is not available, a plaintiff may present circumstantial evidence from which an inference

of intentional discrimination may be drawn. *Armstrong v. Flowers Hosp. Inc.,* 33 F.3d 1308, 1313 (11th Cir.1994). The basic framework for establishing a prima facie case relying on circumstantial evidence is set out in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The allocation of burdens and order of presentation and proof are as follows: (1) the plaintiff has the burden of establishing a prima facie case of discrimination or retaliation; (2) once the plaintiff establishes a prima facie case, the burden shifts to the defendant to articulate a legitimate, non-discriminatory, non-retaliatory reason for the action taken against the employee; and (3) the burden then shifts back to the plaintiff to raise a genuine factual question as to whether defendant's stated reason is mere pretext. *See id.; Richardson v. Leeds Police Dept.,* 71 F.3d 801, 805–06 (11th Cir.1995).

## B. Plaintiff's Prima Facie Case

■ In a failure-to-hire case, the plaintiff establishes a prima facie case by demonstrating that: (1) he was a member of a protected class; (2) he applied and was qualified for a position for which the employer was accepting applications; (3) despite his qualifications, he was not hired; and (4) the position remained open or was filled by another person outside of his protected class.[3] *E.E.O.C. v. Joe's Stone Crabs,* 296 F.3d 1265, 1273 (11th Cir.2002) (in the Title VII context); *Zaben v. Air Products & Chemicals, Inc.,* 129 F.3d

1453, 1457 (in the ADEA context); *Walker v. Prudential Property and Cas. Ins. Co.,* 286 F.3d 1270, 1274–75 (11th Cir.2002) (in both contexts).

The undisputed evidence on the record shows that Roper was a member of a protected class as a 57–year–old male; he applied and was qualified for the dispatcher positions; he was not hired; and the position in Rome was filled by a female in her twenties. In Jonesboro, the position was filled by a female; the parties have not pointed to any evidence regarding her age.[4]

## C. Defendant's Legitimate, Non-discriminatory Reason

■ "After the plaintiff proves a prima facie case of discrimination, the defendant need only to produce evidence that there is a legitimate, non-discriminatory reason for the challenged employment action." *Kelliher v. Veneman,* 313 F.3d 1270, 1275 (11th Cir.2002). Defendant's burden at this stage is "exceedingly light." *Turnes v. AmSouth Bank, N.A.,* 36 F.3d 1057, 1060–61 (11th Cir.1994).

Defendant articulated the following legitimate, non-discriminatory reasons for failing to hire Roper for the Rome dispatch position: Roper's most recent experience was in higher level field positions, and he therefore might not transition easily to an entry level dispatch job, (Def Br. at 6, 10, 11)(Fincher Dep. at 59, 62, 64–65); Myers had six years of more recent dispatch experience based on her application,

---

**3.** In ADEA cases, the individual who filled the position need not necessarily be outside the protected class and under 40 years of age, provided that there is a "discrepancy between the ages ... sufficient that a fact finder could reasonably infer age discrimination." *Corbin v. Southland Int'l Trucks,* 25 F.3d 1545, 1549 (11th Cir.1994).

**4.** Plaintiff does not appear to assert even that Defendant's failure to hire Roper for the Jonesboro position met the prima facie case for discrimination or was a pretext for discrimination. Rather, as discussed *infra,* Sec. IV.E., Plaintiff appears to be asking the Court to determine that the Rome decision was discriminatory and then to infer from that finding that the Jonesboro decision, likewise, was discriminatory.

(Def. Br. at 10–11)(Exh. 11)[Doc. 40]; Myers lived closer and was more familiar with the area, (Def. Br. at 11), (Smith Dep. at 101–04), (Fincher Dep. at 99, 101); Roper's previous Comcast salary was far higher than what was being offered for the position, (Def. Br. at 12), (Smith Dep. at 88–90), (Fincher Dep. 110–11); and Roper's interviewers were concerned from his attitude that he was not really interested in being a dispatcher, but rather just wanted to preserve his Comcast benefits, (Def. Br. at 12–13), (Smith Dep. at 73–74), (Fincher Dep. at 58–66).

With respect to the Jonesboro position, Defendant asserts that, even if Roper had been interviewed for the position, Latrice Adams was more qualified. (Def. Br. at 20–21), (Exh. 14)[Doc. 40]. Defendant further asserts that the same concerns about salary and rank within the company applied to the Jonesboro position. *Id.*

In this case, Defendant has articulated sufficient legitimate, non-discriminatory reasons for its selections. When this is done, "[t]he presumption of discrimination is then rebutted and the employer is entitled to summary judgment unless the plaintiff proffers evidence sufficient to create a genuine issue of material fact that discrimination was actually the reason for the challenged action." *Kelliher v. Veneman*, 313 F.3d 1270, 1275 (11th Cir.2002).

**D. Pretext**

■■■ To survive summary judgment at this stage, Plaintiff must provide evidence that creates a genuine issue of material fact that Defendant's articulated, nondiscriminatory reasons are, instead, pretext for unlawful sex or age discrimination. *McDonnell Douglas Corp.*, 411 U.S. at 804–807, 93 S.Ct. 1817; *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000)(finding that "plaintiff may attempt to establish that he was the victim of inten-

tional discrimination by showing that the employer's proffered explanation is unworthy of credence")(internal citations omitted); *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997). Put another way, the "pretext analysis focuses on a narrow question: Would the proffered evidence allow a reasonable factfinder to conclude that the articulated reason for the decision was not the real reason?" *Walker v. Prudential Property and Cas. Ins. Co.*, 286 F.3d 1270, 1276 (11th Cir. 2002). In evaluating a summary judgment motion, "the district court must evaluate whether the plaintiff has demonstrated such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Jackson v. Ala. State Tenure Comm'n*, 405 F.3d 1276, 1289 (11th Cir.2005)(quoting *Combs*, 106 F.3d 1519, 1538)(internal citations omitted). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir.2004)(quoting *Chapman v. AI Transport.*, 229 F.3d 1012, 1024–25 (11th Cir.2000) (en banc)); *accord Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir.2007) ("[i]f the employer proffers more than one legitimate, nondiscriminatory reason, the plaintiff must rebut each of the reasons to survive a motion for summary judgment"). Accordingly, the undersigned will first address the facts that Plaintiff asserts apply to all Defendant's articulated reasons, and will then address the specific articulated, nondiscriminatory reasons one by one.

### 1. Smith's hiring percentages

█ Plaintiff attempts to ·show pretext through the fact that most of Smith's hires at Comcast have been women and most have also been in their 20s or 30s. The statistics that Plaintiff cites do not, however, reflect a breakdown of the number of applicants, by sex or age, who applied for any of these positions, or include any other information relating to the relevant labor pool. Without this necessary relevant analytical information, such incomplete statistical information is not probative of pretext. *See Wilson v. B/E Aerospace Inc.*, 376 F.3d 1079, 1089 (11th Cir.2004)(finding that evidence that only two of 44 vice presidents were female was "not even probative of pretext because [the plaintiff] has not provided any other relevant information, including the number of women who expressed interest in vice president positions."); *Lee v. GTE Florida*, 226 F.3d 1249, 1255 n. 2 (11th Cir.2000)(calling data about the number of women a particular decisionmaker hired "statistically meaningless" in the absence of data on the number of qualified, female applicants for the positions in question); *Brown v. American Honda Motor Co.*, 939 F.2d 946, 952–53 (11th Cir.1991)(finding that, outside the context of a discriminatory impact case, statistics that only two out of 860 Honda dealers were black were "virtually meaningless" without data on how many African–Americans had applied unsuccessfully and how many equally qualified white applicants had been successful). Accordingly, Smith's hiring percentages, as presented by Plaintiff, do not advance his claims of pretext.

### 2. WICT Membership

█ Plaintiff also argues that Smith's and Fincher's membership in the WICT is evidence of pretext. At least one federal court has held that membership in a minority lobbying group, such as the NAACP, is *not* evidence of discriminatory animus. *See Murray v. United Food & Commercial Workers Union, Local 400*, 229 F.Supp.2d 465, 476 (D.Md.2002). Plaintiff has not cited to any authority holding that membership in a group seeking to promote the advancement of minority involvement in a particular industry is evidence that any individual member of such group acted discriminatorily in making any specific hiring decision. In this particular case, the undisputed evidence shows that neither Smith nor Fincher were active in the organization, and there is no evidence that WICT promoted discrimination in the workplace. (Smith Dep. at 8); (Fincher Dep. at 11). Accordingly, the undersigned does not find any evidence of pretext arising from mere membership in WICT.

### 3. Smith's Statements During Roper's Interview

█ Plaintiff points to Smith's question, put to Roper at his interview, "Do you have any problem working with women? All I have is women," and to her statement that the dispatch room "is where my girls sit," as evidence of pretext. Plaintiff does not allege that these statements are direct evidence, and indeed they are not. *See Damon v. Fleming Supermarkets Of Florida*, 196 F.3d 1354, 1359 (11th Cir.1999) (citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081–82 (11th Cir.1990))("[O]nly the most blatant remarks, whose intent could mean nothing other than to discriminate ... will constitute direct evidence of discrimination."). Comments or remarks that suggest discriminatory animus can, nevertheless, serve as circumstantial evidence to establish pretext, even if they are not direct evidence. *Damon v. Fleming Supermarkets of Fla.*, 196 F.3d 1354, 1362 (11th Cir.1999); *Ross v. Rhodes Furniture, Inc.*, 146 F.3d 1286, 1292 (11th Cir.1998). Such allegedly discriminatory remarks should

be read and considered in conjunction with the entire record. *Ross,* 146 F.3d at 1292.

In the *Ross* case, the remarks that were recognized as circumstantial evidence of pretext were statements by a white man to another white man, "I never seen as many blacks in this building except in a Tarzan movie," and, some time later, "You see that one over there [pointing at the black plaintiff], I am going to get rid of him." *Ross,* 146 F.3d at 1291. Likewise, in *Damon,* the decisionmaker's statement that he wanted "aggressive, young men" to be promoted was considered circumstantial evidence of pretext. *Damon,* 196 F.3d at 1362. On the other hand, questions that reflected an assumption that a female plaintiff would stay home after the birth of her child, a remark about whether or not a married woman "needed to work," and statements expressing surprise that a mother of young children would seek a position that required travel have all been found *not* to demonstrate the discriminatory animus necessary to constitute even circumstantial evidence of pretext. *Norrell v. Waste Away Group, Inc.,* 246 F.Supp.2d 1213, 1224 (M.D.Ala.2003).

In this case, Smith's comments, taken in context, simply do not give rise to any inference that discriminatory animus motivated her decision. The record shows that the dispatcher whose transfer created the Rome vacancy was a male, Ronnie Branton, whom Smith had hired. (Smith Dep. at 30–31); (Exh. 2)[Doc. 40]. Smith's first statement was an observation of fact—after Branton's departure, the Rome dispatch department consisted entirely of female employees—which was combined with a query to confirm that Roper had no reservations about working where he was the only male employee. Smith's second remark merely reflected that she was identifying the location where all the aforementioned female dispatchers sat. Her use of the familiar and informal phrase,

"my girls," does not suggest any animus toward men or male dispatchers. Even viewed in the light most favorable to Plaintiff, these statements do not cast doubt on Defendant's proffered reasons for preferring Myers over Roper.

### 4. *Roper's and Myers's relative qualifications*

██ Plaintiff asserts that Roper's superior qualifications for the dispatch job demonstrate pretext in the selection of Rachel Myers. To show pretext based on qualifications, Plaintiff must show "that the disparities between the successful applicant's and [his] own qualifications were 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff.'" *Brooks v. County Comm'n of Jefferson County,* 446 F.3d 1160, 1163 (11th Cir.2006)(quoting *Cooper,* 390 F.3d at 732); *Champ v. Calhoun County Emergency Management Agency,* 226 Fed.Appx. 908, 914 (11th Cir.2007). "However, where the qualifications disparity is not the sole basis for arguing pretext, the disparity need not be so dramatic to support an inference of pretext." *Vessels,* 408 F.3d at 772.

██ Taken in the light most favorable to the plaintiff, the evidence shows that Roper had a better knowledge of the cable industry than Myers and a greater knowledge of, and familiarity with, both Cable Data and CSG software. He also had recommendation letters from people within Comcast. The uncontested evidence also shows, however, that Myers demonstrated herself arguably better suited for the job in a number of other ways, including the manner in which she presented herself during the interview and her customer service people skills. (Fincher Dep. at 84, 85); (Smith Dep. at 105–06).

Some of the traits evaluated by Smith and Fincher involved subjective judgments, but "subjective evaluations of a job candidate are often critical to the decision-making process." *Chapman v. AI Transport,* 229 F.3d 1012, 1032 (11th Cir.2000). In jobs that require interaction with the public, such as the dispatch job, factors like enthusiasm and appearance can be "vitally important," "yet there are few if any ways to gauge such qualities objectively." *Id.* In this case, the evidence cited by Plaintiff to show that Roper's qualifications were superior to Myers's, therefore, does not outweigh the subjective factors pointed to by Fincher and Smith to support their exercise in impartial judgment in choosing Myers. The disparity between their respective qualifications is simply not sufficient on its own to support an inference of pretext and create a jury issue. *See Vessels,* 408 F.3d at 772. Accordingly, the undersigned will now examine Defendant's specific articulated reasons for failing to hire Roper.

5. *Defendant's Non-Discriminatory Reason for Hiring Myers: Myers's application showed greater, and more recent, dispatch experience*

■ Defendant contended that Myers was a better choice in part because she had greater, and more recent, dispatch experience. Plaintiff contends that Smith gave inconsistent assessments of Myers's dispatch experience on different occasions,

and that these inconsistencies are evidence of pretext as it pertains to this reason for preferring Myers.[5]

Myers worked in dispatch, at Sears, from 1997 until 2001, which is a period of approximately four years. (Myers Dep. at 18). The last time either Roper or Myers actually worked in a dispatch job, before their interviews in Rome, was in 2001. (Pl's SMF ¶ 3); (Myers Dep. at 18). Myers's resumé and application, however, were ambiguous about how much of her time at Sears was actually spent in dispatch, and her resumé suggested that she had worked in dispatch for six years. (Exh. 7)[Doc. 46]. Six months *after* Smith hired Myers, Smith sent Stan Thomas an email stating that, at the time of her hiring, Myers had only three years' dispatch experience. (Exh. 7)[Doc. 46]. On cross examination in deposition, Plaintiff's counsel handed Smith a copy of Myers's resumé, and Smith testified that her understanding, looking at Myers's resumé, was that Myers had six years' experience ending one year before the interview. (Smith Dep. at 102, Exh. 9).

None of this evidence shows pretext. While it appears in retrospect that Myers did not actually have more dispatch experience than Roper, her resumé reflected that she did have more experience and that her experience was more recent. Smith's deposition testimony reflects this understanding.[6] Whether Myers actually

---

5. Plaintiff argues that Smith's and Fincher's beliefs regarding Myers's superior qualifications may have been incorrect. Merely showing that a proffered reason was based on incorrect information does not establish a genuine issue of material fact that the proffered reason was a pretext for discrimination. *Truss v. Harvey,* 179 Fed.Appx. 583, 588 (11th Cir.2006)(citing *Nix v. WLCY Radio/Rahall Communications,* 738 F.2d 1181, 1187–88 (11th Cir.1984)).

6. Plaintiff asserts that Smith's deposition shows that Smith knew all along that Myers's 2002 and 2003 experience was in customer service, not dispatch. (Pl. Br. at 9). Plaintiff asserts, as evidence for this contention, that during the interview Smith asked about Myers's experience dealing with customers. *Id.* Smith's testimony, however, shows that she asked about Myers's experience dealing with customers *as a dispatcher,* not as a customer service representative. (Smith Dep. at 107–08). Smith's testimony is consistent with the information on Myers's resumé.

had 3 or 6 years experience in dispatch, nothing in the evidence shows that Smith or Fincher unreasonably or dishonestly interpreted Myers's resumé as reflecting greater and more recent experience than Roper at the time the hiring decision was made. Accordingly, there is no evidence of pretext in this purported inconsistency.

6. *Defendant's Non–Discriminatory Reason for Hiring Myers: Myers lived closer to Rome and had more familiarity with the area than Roper*

█ Plaintiff asserts that pretext is demonstrated by an inconsistency between the testimony of Fincher and Smith about whether it was advantageous or not that Myers lived close to Rome. Fincher testified that she considered Roper's distance from Rome as a disadvantage, while Smith testified at one point in her deposition that she was not concerned about how far Roper lived from Rome. (Fincher Dep. at 99, 101); (Smith Dep. at 99). Smith, however, made it clear that she considered Myers's prior experience handling dispatch in Dallas, Hiram, and Paulding County an advantage, and that she presumed that Myers's residential proximity to Rome meant she had a geographical familiarity with the area. (Smith Dep. at 101–04, 107). Conversely, if Roper lacked such proximity, this would be a disadvantage. In any event, there really is no inconsistency between Fincher and Smith in their reliance on proximity in evaluating the suitability of the candidates, and the fact that Plaintiff disputes the importance of geographical familiarity as a hiring factor is immaterial. *See Pennington v. City of Huntsville*, 261 F.3d 1262, 1267 (11th Cir.2001)(internal citation and quotation marks omitted)("a plaintiff [ ] may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the

employer's reason as long as the reason is one that might motivate a reasonable employer")(internal citations omitted).

Although Fincher did not question Roper specifically about his commute distance to Rome, Fincher made it clear that she and Smith discussed him as a candidate and shared facts. (Fincher Dep. at 57). Both Smith and Fincher were aware that Myers lived closer to Rome than Roper, and the fact that Smith articulated this as an advantage for Myers and Fincher articulated it as a disadvantage for Roper is not "implausib[le], inconsisten[t], incoheren[t], or contradict[ory]." *See Jackson*, 405 F.3d at 1289.

7. *Defendant's Non–Discriminatory Reason for Hiring Myers: Roper's previously higher Comcast salary*

█ Plaintiff points out that Fincher was concerned about Roper's previous salary and the fact that Roper would have to take a big pay cut, but that Smith did not share this concern. (Fincher Dep. at 111)(Smith Dep. at 91). Plaintiff asserts that this inconsistency between the two shows pretext. Plaintiff relies upon Fincher's testimony that she would not believe Roper if he stated that the salary difference did not matter to him, as opposed to Smith's testimony that she believed Roper when he told her that the salary difference was not a problem for him.[7] (Fincher Dep. at 111)(Smith Dep. at 91). The fact that they did not both share this concern equally, however, is not evidence that the reasons given for Roper's nonselection were pretextual. *See Hillemann v. University of Central Fla.*, 167 Fed.Appx. 747, 750 (11th Cir.2006)(plaintiff did not show pretext where only one of his interviewers considered him "boring" and "unenthusiastic"); *see also Chapman*, 229 F.3d at 1031

---

**7.** Smith also testified, however, that the exact salary amount that Roper told her was not "a

problem" was *higher* than the salary she ultimately offered Myers. (Smith Dep. at 90).

n. 21 ("Different decisionmakers are entitled to be concerned about different things.").

8. *Defendant's Non–Discriminatory Reason for Hiring Myers: Roper's recent experience in higher level, field positions made him less suited to be a dispatcher than Myers*

██ Plaintiff did not directly address Defendant's argument that Roper's recent prior experience in a high-ranking field position at Comcast might make it difficult for him to transition to a lower entry level position. An examination of the evidence also shows no pretext surrounding this legitimate consideration. Fincher testified that she was concerned about Roper moving from a high-ranking field position to a low-ranking desk job. (Fincher Dep. at 64). Smith, on the other hand, observed that Myers had more recent experience dealing with customers and impressed her during the interview as capable of handling irate customers. (Smith Dep. at 105–06, 110–11). In other words, Fincher and Smith were both consistent that Myers's recent experience was more in line with the skill set of an entry-level dispatch desk job, dealing with customers, than Roper's recent work as a safety and compliance officer. (Fincher Dep. at 64); (Smith Dep. at 105–06, 110–11). Nothing in the record indicates that this reason was false, inconsistent, illegitimate, or discriminatory.

9. *Defendant's Non–Discriminatory Reason for Hiring Myers: Roper's attitude during his interview*

██ Defendant cites numerous ways that Roper demonstrated a lack of interest in the dispatch job during his interview. Fincher testified, "his demeanor when he came in was not very good," and, "when I was talking to him ... he [ ] was just sitting there in the room, and it was not like he was interested in being a dispatcher with us." (Fincher Dep. at 57–58). She testified that, "he was not dressed appropriately," and, "[h]is shirt was hanging out." (Fincher Dep. at 61, 63). Fincher also testified, "the way he went about asking about his benefits was something that was a concern to me." (Fincher Dep. at 60). She testified that his attitude conveyed, "I'm a Comcast employee. I'm here. I want the job. Can you tell me about my benefits," rather than conveying that he was "interested in finding out a little bit more about the job besides just, you know, can I start tomorrow." (Fincher Dep. at 60–61). Smith testified that, "I was concerned that, you know, maybe he was just wanting to get [the job] just to get those benefits.... I wanted him to be interested in the job itself." (Smith Dep. at 73–74).

██ Subjective evaluations are legally sufficient, non-discriminatory reasons for a hiring decision. *Chapman*, 229 F.3d at 1033–34, 1036; *accord Cofield v. Goldkist, Inc.*, 267 F.3d 1264, 1268 n. 7 (11th Cir. 2001). When supported by "a clear and reasonably specific factual basis," they must be directly refuted in order to show pretext. *Chapman*, 229 F.3d at 1033–34, 1036. Smith's and Fincher's testimony about Roper's attitude in his interview was clear and supported by reasonably specific facts. Thus, Plaintiff must directly refute Smith's and Fincher's subjective evaluations by showing that they "were not the real reasons for the adverse employment decision." *Chapman*, 229 F.3d at 1024 (citing *Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir.1997)).

The only evidence Plaintiff points to in order to undermine this non-discriminatory reason is Smith's testimony that Roper did not expressly say or do anything to make her think he did not want the job. (Smith Dep. at 74). As stated above, however, Smith also testified that she was concerned Roper only wanted the job for the benefits. (Smith Dep. at 73). These

two statements are not inconsistent. The fact that Roper did not expressly state that he did not want the dispatch job he was applying for does not suggest that Defendant's articulated reasons for not hiring him based upon his demeanor, attitude, and self-presentation are unworthy of credence.

### 10. *Conclusion*

As discussed above, in order to avoid summary judgment, Plaintiff must rebut each of the legitimate, non-discriminatory reasons that Defendant proffers. *Crawford*, 482 F.3d at 1308. In this case, Plaintiff has argued that the evidence shows Roper's qualifications to be superior to Myers's, but the evidence of disparity is insufficient to show pretext on its own. *See Brooks*, 446 F.3d at 1163. Plaintiff has also relied upon alleged inconsistencies regarding some of the reasons articulated by Defendant. Specifically, Plaintiff asserted that there were inconsistencies regarding Myers's dispatch experience, regarding the importance of how close to Rome the two candidates lived, and regarding the significance of Roper's prior Comcast position and higher salary. Plaintiff also asserted that Smith and Fincher gave inconsistent testimony regarding Roper's attitude during his interview. Upon examination, however, these alleged inconsistencies evaporate and do not show pretext. Furthermore, Plaintiff failed to address one of the non-discriminatory reasons Defendant articulated, namely that Roper's most recent experience was in a high-level field position, as opposed to entry level.

Accordingly, the undersigned concludes that Plaintiff has not met its burden on summary judgment to point to evidence demonstrating that each of Defendant's legitimate, nondiscriminatory reasons for not hiring Roper for the Rome position

were pretextual, and Defendant is entitled to summary judgment on this claim. *See Crawford v. City of Fairburn*, 482 F.3d 1305, 1308 (11th Cir.2007)(plaintiff must proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, or the employer is entitled to summary judgment); *Cooper v. Southern Co.*, 390 F.3d 695, 725 (11th Cir.2004)(same); *Chapman v. AI Transport.*, 229 F.3d 1012, 1024–25 (11th Cir.2000) (en banc) (same).

### E. Jonesboro

 As discussed above, *see* Sec.IV.B., Plaintiff did not lay out a prima facie case for age discrimination with respect to the Jonesboro position. Indeed, Plaintiff did not present any evidence regarding pretext in the Jonesboro selection process for either the sex or age discrimination claim. Accordingly, the record does not support the survival of either claim under the burden-shifting analysis of *McDonnell Douglas*. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

Plaintiff argues that the Jonesboro decision was somehow "tainted" by discrimination, because Fincher, motivated by gender- and age-related animus, may have told Stan Thomas, whose approval was necessary for the Jonesboro hire, that Roper was not a suitable candidate. (Pl. Br. at 26–28)[Doc. 46]. But even had the undersigned concluded that Plaintiff could survive summary judgment on his Rome claims, this evidence would not be enough to overcome Plaintiff's failure to demonstrate a prima facie case as to the age discrimination claim or to negate Defendant's legitimate reasons for their actual selection as to the age or sex discrimination claims. *See McDonnell Douglas*, 411 U.S. at 802–04, 93 S.Ct. 1817.[8] According-

---

**8.** Additionally, there is no evidence that

Vanessa Price, the Jonesboro hiring manager,

ly, the undersigned **RECOMMENDS** that the Defendant's motion for summary judgment, [Doc. 40], be **GRANTED.**[9]

## VI.

### *Conclusion*

Accordingly, for the reasons expressed herein, the undersigned **RECOMMENDS** that Defendant's motion for summary judgment be **GRANTED.** [Doc. 40]. Specifically, the Court **RECOMMENDS** that summary judgment be **GRANTED** as to Plaintiff's claims for sex discrimination under Title VII and age discrimination under the ADEA for Defendant's Tucker, Georgia; Panama City, Florida; Rome, Georgia; and Jonesboro, Georgia, hiring decisions. The Clerk is **DIRECTED** to terminate the referral of this case to the undersigned magistrate judge.

ever submitted Roper's name to Stan Thomas for the Jonesboro dispatch job. Indeed, Vanessa Price submitted a different name. If Stan Thomas never had the opportunity to approve or deny hiring Roper, then what Fincher may have said to Thomas is factually immaterial to the Jonesboro hiring decision.

**9.** Because the undersigned has recommended that summary judgment be granted as to all Plaintiff's claims, it is not necessary to consider the parties' arguments regarding punitive damages.